Osvaldo GARCIA–GOYCO and Nadja Bague, personally and on behalf of the conjugal partnership constituted by both; Paso Del Indio, Inc. Plaintiffs

v.

PUERTO RICO HIGHWAY AUTHORITY; Law Environmental Consultants, Inc. d/b/a Law Environmental–Caribe, Inc. Defendants

No. CIV.00–2607CCC.

United States District Court,
D. Puerto Rico.

April 30, 2003.

Guillermo Ramos–Luiña, Esq., Rivera, Tulla & Ferrer, San Juan, PR, for Plaintiffs.

Diego A. Ramos, Esq., Fiddler, González & Rodríguez, Nellymarie López–Díaz, Esq., Reichard & Escalera, San Juan, PR, for Defendants.

## ORDER

CEREZO, District Judge.

This action for breach of contract and copyright infringement is now before us on defendant Law Environmental Consultant d/b/a Law Environmental–Caribe's ("LEC") motion for summary judgment (**docket entry 64**), which the plaintiffs opposed (**docket entry 72**). Plaintiffs supplemented their opposition (**docket entry 77**) and LEC replied (**docket entry 78**). It is LEC's position that there is no federal jurisdiction because there is no copyright infringement since the documents in question are not copyrightable. We, therefore, set out the facts only as they relate to the federal claim.

On March 2, 1993, while constructing a bridge over the Río Indio in Vega Baja, Puerto Rico, a worker informed that excavation equipment had struck an archeological site. The next day members of the Consejo para la Conservación del Patrimonio Arqueológico Terrestre (Consejo), the Institute of Culture and the Puerto Rico State Historic Preservation Office (PR/SHPO) visited the site.[1] They noticed that during the excavation for the foundation of the bridge the prehistoric site was hit several times, destroying various human remains and revealing the presence of food debris, ceramic shards and several layers of inhabitation. In mid-March, the Puerto Rico Highway Authority, contacted archaeologists Adalberto Maurás and plaintiff García–Goyco to make a proposal for the work comprising a mitigation plan. The initial schematic plan was submitted on April 5, 1993; the details are fleshed out in the extension to the plan dated October, 1993. The prehistoric site extended to a depth of 3 meters.[2]

On May 6, 1993, a meeting was held between representatives of the Puerto Rico Highway Authority and Las Piedras Construction Company and archaeologists Maurás and García–Goyco to reach an agreement for the rendering of their services implementing the mitigation plan. *See:* Minutes of May 6, 1993 meeting submitted by plaintiffs, in compliance with order (**docket entry 88**). The agreement set forth in the minutes was signed by both Maurás and García–Goyco who would be compensated $118,000.00 for their services in implementing the mitigation plan. The construction company would provide

---

1. P. 21 of the Extension of the Mitigation Plan of the Paso del Indio Prehistoric Site, one of the documents the copyrightability of which is in issue.

2. Page 24, Extension of Plan, supra.

the equipment, machine operators and technical personnel to be trained by the archaeologists. The minutes reflect, at paragraph 7, that controlled excavations in the bridge area would be made from west to east and that the work areas would be freed up for construction as each excavation concluded. The condition agreed upon at paragraph 7 provides: "[i]n this stage of the process the archeological firm contracted will submit to the Consejo de Arqueología Terrestre (Consejo) a preliminary report for its approval and endorsement ... [t]his endorsement will be obtained by the principal investigators [3] and shall serve as the means for releasing the areas investigated."

The April 5, 1993 Mitigation Plan and the October ___, 1993 Extended Plan set out the personnel involved.[4] The former makes references to an anthropologist and two archaeologists, in addition to Maurás and García–Goyco. The work team was comprised of a total of 31 persons, including eight (8) laboratory technicians and sixteen (16) excavation workers.[5] The latter document includes a list of consultants and technical advisors in twelve different fields, including, among others, analysis of isotopes, botany, ceramics, ethnohistory, geomorphology and soil chemistry. These consultants come from the University of Puerto Rico, four stateside universities and the United States Geological Survey.

Work was halted while the United States Army Corps of Engineers (Corps), as part of its permit authority under Section 404 of the Clean Water Act, determined if the construction of the bridge would have an effect upon the Paso del Indio Prehistoric Site. In 1994, the Corps entered into a Memorandum of Agreement (MOA) with the Puerto Rico State Historic Preservation Office (Puerto Rico SHPO) and the Advisory Council on Historic Preservation (Advisory Council) regarding the Paso de los Indios Prehistoric Site. The "Consejo Para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico (Consejo)" signed the agreement as a concurring party. The Puerto Rico Department of Transportation and Public Works (PRDTOP), through the Highway and Transportation Authority (PRHA), was responsible, as the Section 404 permit applicant, for the plan preparation and for the administration of the construction project. Both the Department of Transportation and the Highway Authority were signatory parties to the MOA. Pursuant to this agreement, the Section 404 permit was issued by the Corps subject to the conditions stipulated therein.

The first of these conditions, set forth as Stipulation 1, required the PRDTOP to ensure that the existing archeological mitigation plan be "implemented prior to those undertaking activities [6] that could disturb the Paso de los Indios prehistoric site." [7] The mitigation plan is described in stipulation 1 of the MOA as including:

> ... a data recovery program, research design and methodology, laboratory and special analyses, the preparation and acceptance of all interim and final reports, adequate curation of the recovered arti-

---

3. Referring to retained archaeologists Maurás and García–Goyco

4. The title page of the April plan indicates that it was prepared by García–Goyco, M.A., while the lengthier October plan was prepared by García–Goyco, M.A.; Maurás, M.A.; physical anthropology consultant Edwin Crespo, M.A.; and with the technical assistance of El Yunque archaeologist Jeff Walker, Ph.D.

5. See pp. 9 and 10 of the Mitigation Plan, attachment to Motion for Summary Judgment (**docket entry 64**).

6. Refers to the construction project of the bridge over the Río Indio.

7. P. 2, MOA

facts, ecofacts, and documentary material product of the data recovery efforts, and the preparation of a National Register Nomination form in accordance with the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (Federal Register, Vol. 48, No. 190, September 29, 1983, Notices), the Advisory Council's publication, Treatment of Archaeological Properties (Advisory Council on Historic Preservation, 1980), 36 CFR Part 79, and all applicable state and federal requirements.[8]

Stipulation 2 of the MOA required that the PRDTOP "... ensure that all materials and records ... are curated in accordance with 36 CFR Part 79" and that it "provide for the curation and final repository sites ... in coordination with the Corps, the Puerto Rico SHPO and the Consejo."

Stipulation 5 of the MOA provides that: The Puerto Rico SHPO and Consejo agree that the Undertaking may proceed once the archaeological fieldwork portion of the mitigation plan is successfully completed and the end of fieldwork report on such work is accepted by the Corps, the Puerto Rico SHPO and the Consejo, on condition that the rest of the terms of this agreement are complied with. The PRDTOP agrees to submit a draft of the final report, incorporating all planned analyses, to the Corps and the Puerto Rico SHPO within 18 months of completion of fieldwork for review and comments, to be followed by the submission of the camera-ready final report six months after the comments of the Corps, the Puerto Rico SHPO and the Consejo are received.

Stipulation 7 of the MOA establishes that any objections raised by the Puerto Rico SHPO or the Consejo to "any aspect of the archaeological study stipulated in this MOA" had to be resolved in consultation with the Corps and the Consejo.

García–Goyco summarized the work done in the first two phases into two bids: Phase One—the Project Mitigation plan; and Phase Two–Proposal for laboratory analysis and preparation of the final report for the second season of excavations. These bids were submitted to the project owners for Phase III—the laboratory phase for the preservation and analysis according to generally accepted archeological and scientific principles.

On February 6, 1997, PRHA notified the plaintiffs that it was contracting defendant Law Environmental Caribe ("LEC") to take charge of the administration of the laboratory phase for Phase III under the MOA. It requested that García–Goyco and his company Paso del Indio, Inc. ("PDI") negotiate their contract for archaeological services, as a subcontractor, directly with LEC. Immediately thereafter, on February 25, 1997, García–Goyco copyrighted the two bids the Mitigation Plan, dated October, 1993, and the Research Design and Proposal based on the 1994–95 work season. In March, 1997 García–Goyco notified PRHA and LEC that they had to negotiate with his company, PDI, for the implementation and use of the Research Design and Proposal since he had copyrighted two documents containing the work from phases I and II.

On September 5, 1997, LEC and PDI formalized their work agreement in a document entitled Archeological Services Agreement, ("the ASA"). Under the ASA, PDI would be an independent technical consultant, and García–Goyco would be the Principal Investigator of the Project. PDI was paid a lump sum compensation of

---

**8.** As stated in the first "Whereas" clause of the MOA, the Paso del Indio prehistoric site was eligible for inclusion in the National Register of Historic Places.

$27,315.00 including expenses, plus office space at the project location and additional payment for secretarial services. In his unsworn declaration in support of the opposition, at paragraph 6, García–Goyco describes his task as "the preparation of the Analysis Proposal and Final Report...."

The ASA included an Addendum A in which LEC stated that it intended to pursue future phases of the project on a "teaming" arrangement with PDI and that it intended to maintain García–Goyco's role as Principle Investigator and Curator during the course of this agreement and subsequent agreements, if any. This addendum also includes the names of twelve other project consultants participating under sub-contracts with LEC.

On November 20, 1998 PRHA formalized its contract with LEC for its services as the prime contractor for the Paso del Indio Project. Two months later, on January 20, 1999, García–Goyco copyrighted, as author and compiler, a third research and work plan, which reworked the two documents from the prior work done for PRHA and the work done pursuant to his contract with LEC.

When LEC failed to follow through with what García–Goyco alleges was a verbal contract reached on April 20, 1999 to hire his services for the last phase and for production of the final report, plaintiffs filed this suit against LEC and PRHA for breach of contract and copyright infringement.

The only allegation of fact as to the infringement claim is contained in paragraph 4.37 of the complaint:

> Upon information and belief, to this day, Law Environmental and the Highway Authority have reproduced, distributed, and utilized in an unauthorized fashion the Research Design and Work Plan without the permission of García–Goyco

as copyright owner and in violation of the exclusive rights granted to him under the applicable copyright laws. Furthermore, upon information and belief, the Highway Authority and Law Environmental have prepared derivative works based on García–Goyco's copyrighted work without his permission and in violation of the exclusive right to prepare derivative works.

It is undisputed that both defendants LEC and the Highway Authority utilized the data in the Research Design and Work Plan prepared by plaintiff pursuant to his contracts with them. The whole purpose for commissioning these mitigation and work plans at the prehistoric site was to allow for the recovery of the artifacts in a manner that caused the least damage and later to preserve the materials discovered which are part of the patrimony of the People of Puerto Rico. The work plans were prepared and implemented at the request of the Highway Authority and other agencies such as the Institute of Culture and the State Historic Preservation Office. The data was compiled and was later used by the parties that retained Garcia Goyco for the purpose stated above. We must decide whether the mitigation and work plans are copyrightable subject matter.

### Validity of Copyright

The three documents in issue are: (1) Project Mitigation Plan for the Paso del Indio Archeological Site, Puerto Rico Highway 22, Río Abajo Ward, Vega Baja; (2) Proposal for the achievement of the laboratory analysis and the preparation of the final report of the second season of excavations in Paso del Indio 1994–1995; and (3) Research design and work plan for the laboratory analysis and the preparation of the report of the Paso del Indio Archeological Project.[9]

---

9. The documents are copyrighted with their original Spanish titles: (1) Project "Plan de

A review of the three challenged documents reveals the following:

The extended mitigation plan of October 1993 begins with the discovery of the three cultural components: Igneri, Pre–Taíno and Taíno and sets out the historical background. García–Goyco expresses his awareness of the narrow parameters for the work:

> Due to the new demands the facilities in the field will have to be substantially enlarged. *The laboratory analysis, the curation of artifacts and the preparation of the report will comply with all the requisites established by the regulatory state and federal agencies.*

(Our translation, our emphasis.) Other topics include the impact of the construction project on the historic site caused by heavy machinery, access routes, and flooding from the river. There is a description of the terrain and flood patterns. There is a list of archeological sites and nearby settlements identified on a map as being in the vicinity of the Río Indio. Also included is a narrative of the historic background-studies done on human remains of prehistoric groups in Puerto Rico.

Also included is a summary of the field investigation. It contains an explanation of the initial mitigation phase that mentions the recovery of ceramic fragments and shell particles and carbon which were placed in labeled bags, as well as other findings, including human remains. The report sets out how the area was divided into quadrants and the trenches dug, the soil sifted, and soil samples taken from all of the strata. There is an inventory of the recoveries from the different areas, by strata. The findings include physical characteristics of the humans whose remains were recovered.

The preliminary analysis on the ceramic shards found at Paso del Indio site includes details of descriptions of the three ceramic styles identified: Sta. Elena, Osteones and Esperanza y Capa. The document also mentions analysis of lithic materials, animal remains, and botanical remains. The fourth section is the research design plan for the next phase of mitigation, including the questions to be researched, e.g., what were the most important symbols in ceramics. Among the many topic headings are "Methods and Techniques of Analysis," "Method and Techniques of Excavation," and "Resources and Field Equipment." Also included are samples of the forms for collecting the data, a "Strategy for Collecting Data" and a bibliography.

The second document in question, the proposal for the carrying out of the laboratory analysis and production of the final report of the second season of archeological excavation in Paso del Indio 1994–1995, has several major components:

The first part begins with a recapitulation of the events at the site that led to this point in the project, a report of the changes in the plans, i.e., revisions of the expected time and cost parameters and justifications for them. Research plans and goals, as well as research questions and the methodology for this phase of analysis, round out this section.

The second part is entitled Summary of the Proposals of the Specialists, which is exactly that: summaries of the proposals found in the last part as well as some

Mitigación del Yacimiento Paso del Indio Carretera Puerto Rico 22;" Bo. Río Abajo, Vega Baja; (2) "Propuesta para la realización del análisis de laboratorio o elaboración del informe final de la segunda temporada de excavaciones arqueológicas en Paso del Indio 1994–1995;" and (3) "Diseño de investigación y plan del trabajo para el análisis de laboratorio y preparación de informe de Proyecto Arqueológico Paso del Indio."

additional summaries, the proposals for which are not included.

Also included is a section entitled Dissemination of Information and Public Service, at page 51, which provides:

Section 79.10 of 36 CFR promulgates that the officials of the federal agencies must assure themselves that the collections within their jurisdiction are made accessible to qualified professionals for study, exhibition, teaching, public interpretation, scientific analysis and scholastic research. They should also promote publications with their due credit.

The multi disciplinary focus and participation of numerous scientists from distinct local and international universities already facilitates the distribution of the information about the project to the scientific community. But besides this the Paso del Indio project has had an ample spread in the local and international press attracting the interest of hundreds of thousands of persons who loyally follow discoveries as they appear.

(Our translation.)

With regard to projections of the spread of information for the laboratory phases and reports, the proposal continues at pages 52–53:

Once the puzzle is solved with the help of the experts from the principal local universities, from the United States and other foreign countries, we will begin to write articles that will be published in newspapers, magazines of general interest and the most prestigious scientific journals on the planet.

.         .         .         .         .

In the long term for the excavations, the audiovisual technicians of the Press Department of DTOP will carry out the filming of more than 30 videotapes of 20 minutes each. They periodically filmed, at our insistence, in order to cover the most important events in the more than 15 months of arduous labor of the largest group ever used in an archeological excavation on the island. In this tapes is also recorded the imposing infrastructure the ACT mounted in order to protect the excavations from inclement weather as well as provide for the visits of important persons from political, social and cultural circles who would be able to admire the unveiling of the mysteries that are taken out of Mother Earth.

.         .         .         .         .

We expect a long time of analysis with instruments and the most advanced technology ever used in an archeological excavation on the island. It is our interest that according to what is stipulated in 36 CFR Part 79.10, the visits of the Press, scientists, students and the general public will be promoted in order than they see the process of analysis of the excavations. Just as the visits to the field are coordinated by means of the DTOP Press office, one afternoon of the week can be set aside in order for interested persons to visit the laboratory.

(Our translation.)

The third part is the work plan for the laboratory, consisting of 20 sections, covering topics that go from the design and construction of the laboratory facilities to the editing of the final report.[10] An extensive bibliography is included.

---

10. The work plan for the Laboratory includes, at page 59, the following topics analyzed by the specialists: physical forensic anthropology, isotopic study of bones, D.N.A., zooarcheology, paleobotony, palinology, paleohydrology, soil chemistry, Carbon 14 and colegen, ceramics, stone, shell, geomorphology, geology, stratagraphy, and remote prospection (radar, magnometry, resistivity).

The last portion consists of the following individual proposals submitted by the special consultants:

1. *Proposal for Stable Isotope Analysis of Human Remains from Pasodel Indio* by Anne V. Stokes

2. *Propuesta Para El Análisis de la Cerámica Del Sitio Arqueológico de Paso del Indio, Vega Baja, Puerto Rico* by Antonio Curet

3. *Propuesta para Análisis de Artefactos de Piedra Tallada de Paso del Indio* by Reniel Rodríguez–Ramos.

4. *Propuesta Análisis de Arqueofauna Paso Del Indio, Vega Baja, Puerto Rico* by Jalil Sued Badillo

5. *Propuesta para el Análisis de Laboratorio de Los Restos Humanos Procedente del Proyecto Arqueológico Paso Del Indio* by Edwin Crespo

6. *Proposal for Archaeobotanical Research: Paso del Indio, Puerto Rico* by Lee Newsom

7. *Propuesta Técnica para el Análisis de Ensamblaje Lítico de la Colección Arqueológica de Paso de Indio, Vega Baja, P.R.* by Adalberto Maurás–Casillas

8. *Propuesta Investigación Geo–Arqueológica del Material Lítico de Paso Del Indio, Vega Baja, Puerto Rico* by Eduardo Questell–Rodriguez

9. *Proposal for Paso del Indio Lab Work* by Jeff Clark

10. *Análisis Dental de los Restos Humanos Recobrados en el Proyecto Arqueológico Paso del Indio: Un Asentanmiento Pre Histórico en Vega Baja, Puerto Rico* by Juan B. Guisti

11. *Propuesta para la Evaluación y Establización a Corto Plazo de la Colección de Materiales Arqueológicos* by García–Goyco, Maurás and Walker.

The last document in issue, the Research Design and Work Plan for the Laboratory Analysis and Preparation of the Report of the Archeological Project Paso del Indio, done in conjunction with LEC and copyrighted by Garcia Goyco in January, 1998, summarizes its contents at page 1 of the document as follows:

The studies made during the second stage resulted in the recovery of an archeological collection and data of great significance for the archaeology of Puerto Rico and the Caribbean. Since the culmination of the second stage the archeological collection has been conserved first in a laboratory in Caparra Terrace and now in a laboratory constructed by the ACT specifically for this project in Canóvanas.

This Research Plan has as its purpose the presentation of the hypotheses, the methodology proposed for the realization of the analytical studies of the collection and the preparation of the report and the final disposition of the collection (Curation) This document has been prepared by the Principal Investigator of the project with the help of various specialists who will participate in the analytical studies and the management of the project. In the following sections we present the components, methods and programing for the development of the study.

(Our translation.)

Within the laboratory work plan, for which plaintiff recognizes the assistance of Arql. Mauras in its preparation we find, at page 71, "10.1 Evaluation of the report by the agencies; 11. Long term curation efforts according to 36 CFR part 79; 12. Editing of the final report, 12.01 Reading of comments from the regulatory agencies."

It is LEC's contention that the papers or works in question cannot be copyrighted inasmuch as facts, ideas, methods, procedures, processes and discoveries are not protected by copyright, even when con-

tained in a copyrighted work. *See,* 17 U.S.C. § 102(b), *see, also, e.g. Lotus v. Borland,* 49 F.3d 807, 813–18 (1st Cir. 1995),( [W]hile original expression is necessary for copyright protection, we do not think that it is alone sufficient. Courts must still inquire whether original expression falls within one of the categories foreclosed from copyright protection by § 102(b), such as being a "method of operation."); *Project Development Group. v. O.H. Materials Corp.,* 766 F.Supp. 1348 (W.D.Pa.1991), judgment affirmed, 993 F.2d 225 (3rd Cir.1993).

Plaintiffs rely primarily on the fact that the statute, at 17 U.S.C. § 410(c), provides that a certificate of copyright registration is prima facie evidence of copyrightability and of the facts stated in the certificate including copyright ownership. They then provide a discussion, in general terms, of the copying of constituent elements which are original and the fact/expression dichotomy standard, making a point of the low level of creativity which allows copyrighting of compilations of facts, as discussed in *Feist Publications v. Rural Telephone Service,* 499 U.S. 340, 348, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Plaintiffs, however er do not apply this analysis to the contents of the works in question nor do they in any way demonstrate that it is original, copyrightable work created by Garcia Goyco himself, as opposed to all of the other contributors.

▆▆▆ Not all works can be copyrighted. Merely because the works were deposited in the Copyright Office and have certificates of registration, does not mean that they were copyrightable subject matter. Expression in the public domain may not be monopolized by mere copyright registration. *See e.g., Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,* 237 F.Supp.2d 376, 384 (S.D.N.Y. 2002) (*"Tufenkian"*) (holding, as a matter of law, that adaptations of subject matter

or expressions in the public domain cannot support a finding of copyright infringement); *Satava v. Lowry,* 323 F.3d805 (9th Cir.2003)(The Copyright Act "denied artists the exclusive right to ideas and standard elements in their works, thereby preventing them from monopolizing what rightfully belongs to the public.") Also, not everything contained in a copyrighted work is protected or actionable. Indeed, it is not rare that something filed in the Copyright Office is not a valid copyright. *Id.* Among other things, facts, ideas, methods, procedures, processes, and discoveries are not protected by copyright, even when contained in a copyrighted work. Copyright protection is limited to those parts of a work that are original to the author. "Originality is a constitutionally mandated prerequisite for copyright protection." *Feist Publications v. Rural Telephone Service,* 499 U.S. 340, 351, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). As a result, it does not extend to facts. *Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 556, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). "This is because facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: the first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Feist,* 499 U.S. at 347, 111 S.Ct. 1282.

Facts are in the public domain and may be freely copied from an author's work. *Harper & Row,* 471 U.S. at 547, 105 S.Ct. 2218, and *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. It does not matter whether the work has a valid copyright, and in the case of factual compilations, "no matter how original the format … the facts themselves do not become original" *Feist,* 499 U.S. at 349, 111 S.Ct. 1282. In factual compilations, "only the compiler's selection and arrangement may be protected; the raw facts may be copied at will. This

result is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art." *Id.* at 350, 111 S.Ct. 1282. *See also* 17 U.S.C. § 103(b) ("The copyright in a compilation ... extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.")

The exemption of facts from copyright protection holds regardless of the amount of labor and expense invested in the research that led to discovery of the fact. *See Applied Innovations, v. Regents of the Univ. of Minn.,* 876 F.2d 626, 636 (8th Cir.1989). This exemption from copyright protection also extends to the research itself. "There is no rational basis for distinguishing between facts and the research involved in obtaining facts. To hold that research is copyrightable is no more or no less than to hold that the facts discovered are a result of research and entitled to copyright protection." *Miller v. Universal,* 650 F.2d 1365, 1372 (5th Cir.1981).

The Copyright Act is clear that copyrights do not grant authors exclusive rights over the ideas, methods, processes, procedures and the like that are described, explained, or otherwise set out in the authors' works.

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work. 17 U.S.C. § 102(b).

As explained over a century ago, the rights granted by copyright extend only to the printing and publishing of the work, whereas exclusive rights over an "idea, procedure, process, system, method of operation, concept, principle, or discovery"

must be obtained by patent. *Baker v. Selden,* 101 U.S. 99, 102–103, 25 L.Ed. 841 (1879).

> To give to the author of the book an exclusive property in the art described therein, when no examination of its novelty has ever been officially made, would be a surprise and a fraud upon the public. This is the province of letters-patent, not of copyright. The claim to an invention or discovery of an art or manufacture must be subjected to the examination of the Patent Office before an exclusive right therein can be obtained; and it can only be secured by a patent from the government.

*Baker, supra,* at 102, 11 Otto 99.

Under the MOA, the mitigation plan was subject to the constraints of the Standards and Guidelines for Archaeology and Historic Preservation of the Secretary of the Interior; the Advisory Council's publication, Treatment of Archaeological Properties, 36 CFR Part 79, and all applicable state and federal requirements. MOA Stip. 1. The plan for the curation and final repository sites for the collection had to comply with all applicable state and federal standards, in coordination with the Corps, the Puerto Rico SHPO and the Council. MOA Stip. 2. PRDOT had to submit a draft of the final report, incorporating all planned analyses, to the Corps and to the Puerto Rico SHPO for review and comments, to be followed by the submission of the camera-ready final report six months after the comments were received. MOA Stip. 5. Any objections raised by the Puerto Rico SHPO or the Consejo to "any aspect of the archeological study stipulated in the MOA" had to be resolved in consultation with the Corps and the Consejo. MOA Stip. 7.

While a compilation of facts may possess the requisite originality, *id.,* in order for García–Goyco to be entitled to copyright

protection in the facts, he must show that there is a modicum of originality in the selection and arrangement of such facts. *Project Development Group, Inc., supra,* at 1354. We find that plaintiffs have failed to do this.

■ "In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to defendant to demonstrate why the copyright is not valid" *Lotus v.Borland, supra,* at 813, quoting *Bibbero Sys. Inc v. Colwell Sys.,* Inc. 893 F.2d 1104, 1106 (9th Cir.1990); *see,* also 17 U.S.C. § 410(c); *Folio Impressions, Inc. v. Byer California,* 937 F.2d. 759, 763 (2d Cir.1991). Defendant LEC has rebutted that presumption, relying on 17 U.S.C. § 102(b), as quoted above.

Additionally, Copyright Office Circular 31 maintains that "Copyright protection is not available for 'ideas or procedures for doing, making, or building things; scientific or technical methods or discoveries; ...or any concept, process [or] method of operation.'" *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 72 (2nd Cir.1994). Unlike the Patent Office, the Copyright Office does not ordinarily examine the submissions to determine whether or not the material is copyrightable.

The basic rule of copyright law was established as long ago as *Baker, supra,* and has held up since. *See Feist, supra,* 499 U.S. at 350, 111 S.Ct. 1282.

The description of the art in a book, though entitled to the benefit of copy-

right, lays no foundation for an exclusive claim to the art itself. The object of the one is explanation; the object of the other is use. The former may be secured by copyright. The latter can only be secured, if it can be secured at all, by letters-patent. *Baker,* 101 U.S. at 104, 11 Otto 99.

The reports are public domain records free for all to use and copy. As stated above, the mitigation plan is first mentioned in Stipulation 1 of the Memorandum of Agreement signed by the federal agencies, the Highway Authority, the PRDOT and the Council in 1994. Stipulation 2 ensures that "all materials and records resulting from the mitigation conducted at the ... prehistoric site are curated in accordance with 36CFR Part 79...." [11] The three works in issue are part of the records.

Following though with this theme, the contractual Agreement for Professional and Technical Services between PRDOT and PRHA and LEC, at Article XII delineates the ownership of documents:

...The [PRHA AND PRDOT] will have *a complete and unrestricted ownership rights* to all Reports, Technical Memorandums, plans, data, data bases, maps surveys, inventories, spreadsheets, computer application(s), or *any other work product, pertinent information gathered or documents prepared by [LEC] in connection with the services' performances.* The same, pursuant to this Agreement, will become the property of [PRHA AND PRDOT] without restrictions or limitations upon their use and

(i) Records relating to the identification, evaluation documentation, study, preservation or recovery of a resource....

.     .     .     .     .

(v) Administrative records relating to the survey, excavation or other study of the resource (such as scopes of work, requests for proposals, research proposals ... reports,....)

---

11. 36 CFR § 79.2(2) defines "Associated records" as follows:

... original records (or copies thereof) that are prepared, assembled and document efforts to locate evaluate record, study, preserve or recover a prehistoric or historic records.... Classes of associated records ... that may be in a collection include, but are not limited to:

shall be available to [PRHA AND PRDOT] at any time upon [PRHA AND PRDOT]'s request. However, any reuse of any [LEC] provided document shall be at any other entities sole and exclusive risk. *[LEC] agrees to take appropriate action with respect to its Associates, Subconsultants and /or Subcontractors to ensure that the obligations regarding this matter of information management, ownership and release herein stated can be fully satisfied.*

(Our emphasis.)

In order to comply with this article and implement it in their Archeological Services Agreement, LEC and Garcia Goyco/PDI included the following paragraph in Article VII:

*All* drawings, sketches, designs; manuals, data specifications; notebooks, technical and scientific data, and all photographs, negatives, electronically encoded data, *reports, findings, recommendations, data and memoranda of every description relating thereto,* as well as all copies of the foregoing, and *any and all services and products* (including all software) arising from the services (hereinafter collectively identified as *"Work Products and Items" performed under this Agreement shall be submitted to [LEC] who will in turn submit these materials to the CLIENT)* (Autoridad de Carreteras y · Transportación "ACT") at the conclusion of the project for their curation.

(Our emphasis.)

The reports are functional records whose purpose is compliance with the MOA and the federal regulations incorporated thereunder. *See, e.g., TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (Functional features are not pro-

tected by trademark law); *see also, Tufenkian, supra* (holding that, as a matter of law, adaptations of public domain expression cannot support a finding of copyright infringement). *See also, for example, Baystate Technologies, Inc. v. Bentley Systems, Inc.,* 946 F.Supp. 1079, 1090 (D.Ma.1996)("Baystate's copyright of the Part File Tool Kit documentation does not grant it an exclusive right to use the information conveyed in that documentation and thus, Infotech's use thereof does not infringe that copyright"); *Affiliated Enterprises v. Gruber,* 86 F.2d 958, 961 (1st Cir.1936)("However good and valuable an idea, plan, scheme, or system is, the moment it is disclosed to the public without the protection of a patent, it becomes public property ... As the system has not been copyrighted and, being in no sense a writing, could not be and has not been patented, if it could be, we are constrained to hold that, although plaintiff has expended time and money in originating and developing a system, it has no property right therein which has been appropriated by the defendants"); and *Dunham v. General Mills,* 116 F.Supp. 152, 154 (D.Ma. 1953)("The copyright gives no exclusive right to practice or use the arts and methods described in the copyrighted work.")

■ By plaintiffs own description, the compilations are a plan for site mitigation; a proposal for carrying out the laboratory analysis, and for preparing the final report for the 1994–1995 season; and the research design and work plan laboratory analysis and preparation of the final report. Addendum B of plaintiffs' agreement with LEC sets out in detail the scope of work for the development of the research design and work plan. Tasks included, among many:

1. Establish the protocol [12] for the curation of the archaeological collection.

---

**12.** A formal or official statement of a transaction or proceeding; *spec.* the detailed record

of the procedure and results in a scientific

2. In consultation with [LEC] and consultants, identify a set of research objectives and questions for analysis. . . .

3. Prepare a protocol for the analysis and treatment of human remains and describe the research objectives.

4. Develop in consultation with [LEC] a sampling strategy. . . .

5. Develop a classificatory system . . . in consultation with various consultants of the team.

6. In consultation with [LEC], prepare a protocol for the laboratory analysis of artifacts. The specialists will provide descriptions of their particular protocols.

7. Develop an outline for the Project's Final Report.

8. Develop a schedule for the analytical and report preparation tasks.

9. Provide [LEC] with a time and cost estimate for PDI's services for their participation in the analytical and report preparation tasks.

10. Assist in the preparation of a Response to the Agency Review Comments. . . .

Given the constraints of the MOA and the federal and state requirements with which García–Goyco had to comply, as well as the nature of the work plans he had been retained to create, as exemplified by the service agreement (ASA) between PDI and LEC, the minutes of the May 6, 1993 meeting (**docket entry** 88), the contents of the work plans and documents themselves, we conclude that, besides its content of historical fact discoveries, the three documents are primarily procedures and meth-

ods of operation for the recovery, analysis and reporting of findings related to an archeological site and, therefore, not copyrightable under Section 102(b). Accordingly, the plaintiffs' allegations against LEC of copyright infringement must fall.

For the above-stated reasons, the defendant's motion for Summary Judgment (**docket entry** 64) is GRANTED. The copyright claims are dismissed, with prejudice. Plaintiffs' pendent state claims are dismissed without prejudice for lack of subject matter jurisdiction. *See United Mine Workers v. Gibbs* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rodriguez v. Doral Mortgage Corp.* 57 F.3d 1168 (1st Cir.1995).

SO ORDERED.

### JUDGMENT

For the reasons stated in our Order of this same date the copyright claims are DISMISSED, with prejudice. Plaintiffs' pendent state claims are DISMISSED, without prejudice, for lack of subject matter jurisdiction.

SO ORDERED AND ADJUDGED.

experiment; hence experimental procedure. *Oxford English Dictionary,* online, (2nd

Ed.1989).